**Elmer Lee PHILLIPS and Nilda Phillips, Plaintiffs and Appellants,**

v.

**Dr. J.A. SMITH, Jr., University Medical Center, and Jane Does Nos. 1–5, Defendants.**

**Ungricht, Randle & Deamer, Real Party in Interest and Appellee.**

No. 20873.

Supreme Court of Utah.

Jan. 23, 1989.

Brian C. Harrison, Provo, for plaintiffs and appellants.

Steven Randle, Salt Lake City, for real party in interest and appellee.

ZIMMERMAN, Justice:

Nilda Phillips appeals from an order enforcing an attorney's lien. Nilda and her now-deceased husband, Elmer Lee Phillips, brought a medical malpractice action, initially retaining the law firm of Ungricht, Randle & Deamer ("the Ungricht firm"). Before any resolution was achieved, the Phillipses terminated their relationship with the Ungricht firm and hired new counsel. The new counsel negotiated a settlement. The Ungricht firm sought to enforce an attorney's lien on the settlement amount, claiming it was entitled to a contingency fee of one-third of the settlement figure. The trial court ruled in favor of the Ungricht firm. We reverse because we find the attorney's lien to be invalid.

In November of 1983, the Phillipses retained the Ungricht firm to represent them in a medical malpractice claim against Dr. J.A. Smith, Jr., the University of Utah Medical Center, and others. The claim arose out of an operation performed by Dr. Smith on Mr. Phillips. The Phillipses and the Ungricht firm entered into a preprinted written contract that provided for the payment to the firm of a contingent fee of one-third of the "amount recovered."

The Ungricht firm gave defendants advance notice of the Phillipses' intent to sue, as required by section 78–14–8 of the Code, and then opened settlement negotiations. Utah Code Ann. § 78–14–8 (1987). The hospital and other defendants offered $35,000 to settle the case. The Ungricht firm sent the Phillipses a letter dated June 15, 1984, advising them to accept the offer and expressing doubt that either further negotiations or a trial would result in a larger recovery. The letter, written by Michael L. Deamer, stated in pertinent part:

In my opinion and in the opinion of Jerry Ungricht of this office, we very strongly recommend that you consider and take the settlement offer. This is based upon our careful evaluation of the case and subsequent evaluations in light of conversations with you and subsequent evaluations in light of our investigation of recoveries for similar personal injuries. I can appreciate that you feel you have

been badly wronged and you ought to receive $100,000 or even a Million Dollars. In my opinion you will never receive those amounts.

The letter also described four alternative courses of action then available to the Phillipses. Options one and three are at issue here.

1. Terminate this law firm's representation of the matter and turn the matter over to another law firm.

2. Hire another attorney at your expense to make a "second opinion" analysis of the facts and evidence.

3. Authorize me to make a counter offer for $25,000 in cash plus a pass through of the medical bills with further authorization to accept some amount in that range including a figure half way between, subject to your final approval.

4. Accept the offer as currently stated.

The Phillipses rejected the offer and instructed the Ungricht firm to continue settlement negotiations and to make a $45,000 counter offer. Through further negotiations, the firm obtained a settlement offer of approximately $40,000. The firm communicated the offer to the Phillipses, who rejected it and terminated the employment of the Ungricht firm. The Phillipses then retained another firm to pursue their claim.

After being discharged, and before any suit was filed or settlement consummated, the Ungricht firm filed a "Notice of Attorney's Lien" against the Phillipses for $13,-161.44, one-third of the $40,000 settlement offer negotiated by the firm. The Phillipses, through their new counsel, then formally filed suit against the hospital and other defendants. Eventually, new counsel negotiated and the Phillipses accepted a settlement of approximately $40,000, on terms essentially identical to those defendants

had offered before the Ungricht firm was discharged and new counsel retained.

The hospital, having been notified of the Ungricht firm's lien on the settlement amount, moved for a determination of the Ungricht firm's entitlement to the claimed attorney fee. The Ungricht firm moved for an order enforcing its attorney's lien. The trial court issued an order enforcing the lien for $13,314.78. That order is the subject of this appeal. The parties have placed $15,000 in an interest-bearing account to await a final determination of this issue.

■ Before this Court, Mrs. Phillips[1] challenges the trial court's order on various procedural grounds that we do not reach because we find the underlying attorney's lien to be invalid. The lien asserted by the Ungricht firm is a statutory creature governed by section 78–51–41 of the Code. That section provides in pertinent part:

The compensation of an attorney and counselor for his services is governed by agreement, express or implied, which is not restrained by law. From the commencement of an action,[2] or the service of an answer containing a counterclaim, the attorney who appears for a party has a lien upon his client's cause of action or counterclaim, which attaches to a verdict, report, decision or judgment in his client's favor and to the proceeds thereof in whosesoever hands they may come, and cannot be affected by any settlement between the parties before or after judgment.

Utah Code Ann. § 78–51–41 (1987).

■ Under the statute, an attorney's lien can arise only out of the "agreement, express or implied" between the lawyer and the client. Therefore, the statutory lien is only as good as the underlying agreement regarding compensation. *Cf. Bishop v.*

1. Elmer Lee Phillips died shortly after settlement of the malpractice claim.

2. Although we do not reach the issue because it was not raised on appeal, we observe that the statutory attorney's lien would appear to be unavailable to the Ungricht firm, even if the fee agreement had covered the contingency that arose in this case. The statute requires that there be a "commencement of an action" before

any lien arises. Utah Code Ann. § 78–51–41 (1987). An action is "commenced" in Utah when a complaint is filed. Utah R.Civ.P. 3. While it represented the Phillipses, the Ungricht firm did not file a complaint. It went no further than filing a notice of intent to sue pursuant to Utah Code Ann. § 78–14–8. That does not appear to satisfy the technical requirements of the lien statute.

*Parker*, 103 Utah 145, 151, 134 P.2d 180, 183 (1943) (applying the predecessor to section 78–51–41). Here, the agreement was set forth in a written contract between the Ungricht firm and the Phillipses that states in relevant part: "I agree to pay my attorneys for the above legal services as follows: Retainer $500 for costs. One-third (⅓) of amount recovered and value less costs advanced."[3] In order for the statutory lien to attach as the Ungricht firm argues, this agreement must be read as providing for payment to the firm of a fee of one-third of the amount of any recovery obtained by the Phillipses on their malpractice claim, even a recovery resulting from the efforts of a successor attorney after the termination of the relationship between the Ungricht firm and the Phillipses and without regard to any fee arrangement the Phillipses may have made with successor counsel. We conclude that the contract cannot be so read.

In interpreting the contract, we must be mindful of the general principle that a court will strictly construe terms in a contract against one who is "both the attorney draftsman of and a party to the instrument." *Continental Bank & Trust Co. v. Bybee*, 6 Utah 2d 98, 102, 306 P.2d 773, 775 (1957). We also note that in the present circumstances, this principle is reinforced by the fact that the instrument at issue relates to an attorney/client contingent fee arrangement. The present Rules of Professional Conduct of the Utah State Bar require that all contingent fee agreements be in writing.[4] That requirement, which does not apply to other types of fee arrangements, reflects in part a concern that contingent fee arrangements are particularly likely to be misunderstood by clients. That concern is enhanced where the clients are unsophisticated with respect to legal matters as in the present case. The rule is meant to ensure that clients will be fully informed as to the terms and consequences of the contingent fee agreement.

The written contract in the present case is silent concerning the liability of the Phillipses for the contingent fee should either they or the law firm terminate the relation-

---

**3.** The contract is a standard form agreement prepared by the Ungricht firm. The specific matters of representation and fee arrangement are handwritten in spaces provided on the form. These handwritten portions are indicated here with italics. The complete written contract states:

EMPLOYMENT AGREEMENT

I, [sic] hereby retain and employ the law firm of UNGRICHT, RANDLE & DEAMER ... as my attorneys in the following matters: *Medical Malpractice Action for Elmer Lee Phillips.*

I agree to pay my attorneys for the above legal services as follows: Retainer *$500 for costs. One-third (⅓) of amount recovered and value less costs advanced.*

I agree that the above retainer shall be the minimum fee charged and unless otherwise agreed in advance, the terms of this agreement shall extend to other matters for which the client requests services after the date of this agreement.

I agree additionally to pay court costs, filing and service fees, subpoena costs, photos, court reporter costs, traveling and lodging expenses of my attorneys outside of Salt Lake City, Utah, long distance telephone calls and word processing costs, when billed to me periodically.

I acknowledge that the above attorneys have not made any guarantee regarding the successful termination of said legal matters, and I request that my attorneys not settle nor compromise this matter without my express approval.

In the event I fail to pay the fees and costs when billed, for whatever reason, I hereby grant my attorneys a lien on said legal matters and agree to pay interest on all amounts overdue thirty days or more at an annual percentage rate of 18% (1½% per month) until paid, plus all court costs and reasonable attorney's fees to enforce collection.

**4.** Rule 1.5(c) provides:

A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited.... A contingent fee agreement shall be in writing and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter and, if there is a recovery, showing the remittance to the client and the method of its determination.

Utah Rule of Professional Conduct 1.5(c).

ship before any recovery is obtained. It simply provides for a flat fee of one-third of the recovery. We conclude that as a matter of law, the agreement must be interpreted as being predicated on the assumption that the Ungricht firm would handle the matter through its conclusion by settlement or trial and that its drafter completely failed to provide for the possibility that the firm or the clients might choose to terminate the relationship before the claim was resolved. Since the agreement here did not provide for the contingency that arose, the lien founded upon the agreement is invalid.

Our conclusion regarding the agreement's meaning is supported by the letter sent by the Ungricht firm to the Phillipses on June 15th. The letter outlined four alternative courses of action that the Phillipses could consider in evaluating defendants' settlement offer of $35,000. One of these alternatives was to "[t]erminate this law firm's representation of the matter and turn the matter over to another law firm." The letter did not suggest that if the Phillipses followed this course, they would still have to pay the Ungricht firm a full one-third of any money the Phillipses might obtain at some future date through the efforts of their new lawyers as well as paying a fee to the new lawyers. Yet the knowledge of such a liability would have been of great importance to the Phillipses in weighing the relative advantages of the various options set out in the letter. The silence of the letter regarding any liability for the contingent fee supports our conclusion that the parties' fee agreement did not provide for the possibility of the Phillipses' dismissing the Ungricht firm and seeking other counsel before settlement.

Finally, the interpretation argued by the Ungricht firm could lead to an unconscionable result. For example, if the Phillipses' new counsel had settled the claim for double or quadruple the amount negotiated by the Ungricht firm, the Ungricht firm would be entitled to a full one-third of that larger sum even though it had not contributed to obtaining the larger sum. Such a result certainly cannot be presumed to have been within the contemplation of the parties to the fee agreement in the absence of very clear language to that effect in the agreement.

We are cognizant that the facts of this case may make it appear inequitable to invalidate the attorney's lien and leave the Ungricht firm without that guarantee of compensation for the services performed. However, equitable principles are not at issue here.[5] An attorney's "charging" lien under section 78–51–41, as opposed to a common law "retaining" lien, see Midvale Motors, Inc. v. Saunders, 21 Utah 2d 181, 183–84, 442 P.2d 938, 940 (1968), is purely a creature of statute. The lien's validity is dependent upon the terms of the agreement between the lawyer and the client. Here, the express agreement of the parties did not provide for the possibility that Ungricht's representation of the Phillipses would be terminated before the Phillipses' claim was settled. Therefore, the Phillipses owed the Ungricht firm nothing under the written contract when they terminated that representation.

The trial court's order enforcing the attorney's lien is reversed.

HALL, C.J., and DURHAM, J., concur.

STEWART, Justice: (dissenting).

I respectfully dissent.

The plaintiffs hired the law firm of Ungricht, Randle & Deamer ("Ungricht") to pursue a medical malpractice claim against the defendants. The plaintiffs were to pay Ungricht a one-third contingent fee. Ungricht filed the required notice of intent to commence an action, performed much of the legal research, prepared a complaint (although it was never filed), engaged in multiple settlement offers and negotiations, and obtained a settlement offer of

---

5. The Ungricht firm may be entitled to compensation under a *quantum meruit* theory, but we do not reach that question because the present action only involves enforcement of a statutory lien. For this reason the issues addressed by Justice Stewart have no bearing on the disposition of this appeal.

$39,984.31. The Phillipses were dissatisfied with the offer, discharged Ungricht, and hired Brian C. Harrison, who presently represents the Phillipses. He was to be paid a one-quarter contingent fee. Eight months later, Harrison obtained an identical settlement offer, and the case was settled.

The majority focuses on whether Ungricht has a lien under Utah Code Ann. § 78–51–41 (1987). The majority properly states that the statutory attorney's lien, § 78–51–41, "is only as good as the underlying agreement regarding compensation." While that is true, the real question in this case is, how much compensation is owed Harrison and how much is owed the Ungricht firm? Because of the special nature of attorney fees contracts and the power of the courts over fee agreements, the question of what is owed the two groups of attorneys ought to be decided in one proceeding. Indeed, requiring them to be decided in two separate proceedings, as the majority does, is not only inefficient and costly, but also will likely lead to mischief and inequitable results. The attorneys and the trial court recognized as much in the proceedings below—indeed, the parties stipulated to the court's settlement of the entire fee controversy in this case.

The majority's ruling will be unnecessarily burdensome to the Phillipses, the Ungricht law firm, and possibly to Harrison. In effect, the majority holds that Harrison is entitled to the full contingent fee although he reached a settlement identical to the proffered settlement obtained by Ungricht. The majority suggests that the Ungricht firm may, however, recover something in a second, independent suit based on *quantum meruit*, but that may subject the Phillipses to a fee that may or may not be equitable from their point of view, having already paid Harrison a full fee.[1]

The awarding and approving of attorney fees is subject to the inherent power of a court to regulate the professional conduct of attorneys. *Seal v. Pipeline, Inc.*, 731 F.2d 1194, 1196 (5th Cir.1984) (citing *Schlesinger v. Teitelbaum*, 475 F.2d 137 (3d Cir.), *cert. denied*, 414 U.S. 1111, 94 S.Ct. 840, 38 L.Ed.2d 738 (1973)). The existence of an attorney-client relationship is governed not only by contract law, *see Anderson v. Gailey*, 100 Idaho 796, 801, 606 P.2d 90, 95 (1980), but also by numerous ethical principles. *See* Rules of Professional Conduct, Rule 1.5 (adopted by Utah Supreme Court, effective January 1, 1988).

It has been held unjust for attorney fees to exceed the amount provided by a single contingent fee agreement when successive law firms are involved, as here. *See Reubenbaum v. B. & H. Express, Inc.*, 6 A.D. 2d 47, 174 N.Y.S.2d 287, 290–91 (1958). *But see Adams v. Fisher*, 390 So.2d 1248, 1251 (Fla.Dist.Ct.App.1980). That result, however, may depend on the understanding of the attorneys and the client.

The time and place to resolve the issue is clearly in the trial court on remand. All interested parties will be before the court. The only issue to settle will be the claims of counsel to the funds set aside as attor-

---

1. Damages are recoverable for breach of contract where the attorney under a contingent fee arrangement has been discharged without cause:

It has been held that where an attorney is employed on a contingent contract to perform legal services, his discharge without fault on his part, before he has performed his work, constitutes a breach of the contract and renders the client liable to respond in damages. The measure of damages in that situation is the agreed percentage of the amount the client is subsequently able to secure by settlement or judgment less a fair allowance for services and expenses not expended by the discharged attorney in performing the balance of the contract. In some instances the right to recover the full fee has been upheld.

Other cases, although allowing the attorney to recover as for breach of contract, do not allow the full fee as the measure of damages where the employment contract had not been substantially performed.

Some cases hold that an attorney discharged under a contingent fee contract without fault on his part may at his election recover the reasonable value of the services rendered up to the time of discharge. In other jurisdictions the discharged attorney has no election and may not recover on the contract, but is restricted to a quantum meruit recovery.

7 Am.Jur.2d *Attorneys at Law* § 298, at 321–22 (1980) (footnotes omitted). Whether there was a discharge here has not been determined.

ney fees. In dealing with a problem similar to the one at hand, the court in *Seal* stated:

> The dispute before the court is not one between a client and an attorney over the validity of an employment contract or the setting of a fair fee. The fee has been found fully earned and appropriate, albeit on the high side of this court's preference. The sole issue is apportionment of the earned fee between the lawyers who earned it.
>
> The magistrate chose to apportion the fee as between Bart and Robin, allowing Bart 13% and awarding the balance to Robin. Breland, the first attorney employed, was compensated exclusively on a *quantum meruit* basis. We find that disparate treatment inappropriate under the circumstances of this case.
>
> The scenario of seriatim attorneys is regrettable, but as the magistrate found, Breland and Bart were discharged without cause. Each was retained by Seal to assist in the recovery of damages for his injuries. Each undertook the same professional obligations. Each had the same 40% contingent fee agreement. Each contributed to the ultimate result. Each is entitled to the same evaluation of his contributions and professional efforts, measured by the guidelines established by DR 2–106(B) of the Code of Professional Responsibility....

731 F.2d at 1195–96.

A just result can only be obtained by apportioning fees among the successive counsel. *See, e.g., Seal*, 731 F.2d at 1196; *LaBach v. Hampton*, 585 S.W.2d 434 (Ky. Ct.App.1979). And that should be done in one proceeding before disbursement of proceeds from which the fees should be paid. *Continental Bank & Trust Co. v. Bybee*, 6 Utah 2d 98, 306 P.2d 773 (1957), and *Midvale Motors, Inc. v. Saunders*, 21 Utah 2d 181, 442 P.2d 938 (1968), which are relied on by the majority, are not applicable to this case.

A determination of the total fees payable and an apportionment of them between the attorneys, if appropriate, in the trial court is exactly what all the parties wanted. Their express stipulation authorized the trial court to resolve the issue of attorney fees:

> The Court: Is it stipulated that I can hear this matter with regards to the lien, attorney's lien for fees in this matter?
>
> Mr. Harrison: Yes.
>
> The Court: So, *there will be no need for any type of further action and based upon what is presented to me today I can make a decision as to whether or not they're entitled to fees.*
>
> Mr. Harrison: I think if the Court looks at the law—I brought a case that should be dispositive on the issue, your Honor, and I believe once the court reviews that case that the course will be clear.
>
> So, I guess with that provision I suggest that I think the court should hear that issue of the attorney's lien that was filed by predecessor counsel, and I think that is appropriate prior to defendant's and our settlement being entered as a court order.
>
> The Court: Is that agreeable with all parties, then?
>
> Mr. Randle: That's agreed, your Honor.
>
> The Court: Is that agreeable, Mr. Harrison?
>
> Mr. Harrison: Yes.
>
> . . . .
>
> The Court: So, we all understand that I will determine, first of all, whether they have a right to a lien. If they have a right to a lien, there may be the necessity of an evidentiary hearing to determine the amount of fees you're entitled to. Is that stipulated to by all parties, that that is the issue before me?
>
> Mr. Harrison: Yes.
>
> Mr. Randle: Yes.

(Emphasis added.)

This case should be reversed and remanded for an apportionment of fees between the Ungricht firm and Harrison.

HOWE, Associate C.J., concurs in the dissenting opinion of STEWART, J.